## Commonwealth *v.* Williams, Appellant.

*Criminal law—Election law—Crime against the ballot—Conspiracy.*

A clerk of elections may be convicted with the other election officers of conspiracy to violate the election laws, where it appears that he was present during the whole election day, saw without protest numerous illegal acts committed by the election officers, took part in the count and signed the election return.

Argued March 15, 1906. ·Appeal, No 239, by defendant, from judgment of Q. S. Phila. Co., Nov. T., 1905, No. 156, and Aug. T., 1905, No. 757, on verdict of guilty in case of Commonwealth v. Benjamin Williams et al. Before RICE, P. J., PORTER, HENDERSON, MORRISON, ORLADY, HEAD and BEAVER, JJ. Affirmed.

Indictment for conspiracy. Before WILTBANK, J.

The facts are stated in the opinion of the Superior Court.

Verdict of guilty upon which judgment of sentence was passed.

*Error assigned* was in refusing binding instructions for defendant.

*William T. Connor,* with him *John R. K. Scott* and *J. Joseph Murphy,* for appellants.

*Chester N. Farr, Jr.,* assistant district attorney, with him *John C. Bell,* district attorney, for appellee.

OPINION BY HEAD, J., June 30, 1906:

Seven of the eight assignments of error in this appeal are identical with those disposed of in the case of Commonwealth v. Thomas H. Hartman, Jr., ante, p. 364, and for the reasons therein set forth, which need not be repeated here, all of these assignments must be overruled. The remaining assignment in this case is based on the refusal of the learned trial court to direct a verdict of not guilty as to this appellant. The request for such direction must have been based on the assumption there was no evidence be-

fore the jury on which a verdict of guilty could rest. What, then, was the situation when the court was asked to direct a verdict in favor of the appellant? Williams was one of the election officers, being one of the clerks, and was present during the entire day from before the polls were opened in the morning until the votes were counted and the returns signed late in the evening. There was testimony tending to prove that as soon as the polls were opened and before any ballot had been put in the box thereafter, a demand was made by one of the watchers that the box be opened so that it could be known it was empty, which demand was refused. That the watcher then attempted to seize and shake it for the same purpose, but was prevented by the others present who surrounded the box. That Williams was then present. That during the day he kept one of the voting lists. That in the evening before the polls closed an attempt was made to " grab " the window book of the same watcher, which was torn in the scuffle, after which the watcher was ejected from the polling place. That only 172 votes had been actually cast during the day, but that when the box was opened 372 ballots were found therein, read off and counted, the appellant assisting in the count. That several attempts to remove from the room during the count the various return papers, were made by members of the board, but were detected by the watcher present, who openly called attention to them and prevented them until after the number of ballots in the box was ascertained. That the papers were finally removed and kept out of the room for a long time, when they were brought back and about midnight signed by all of the election officers, including the appellant. These returns, in duplicate, certified that 372 votes had been cast and they were counted for the various candidates. All these things transpiring in the polling place were seen and heard by the witnesses who testified to them. Could they have escaped the observation of the appellant? The witness Monaghan, on pages 216, 217 of the appendix, after describing the efforts to remove the election papers from the room, testifies as follows : " Finally Charlie (Charles Judge, one of the defendants) knocked the books on the floor back of the counter. Next he opened his vest, got down, and made an attempt to put the books inside his vest. I called to him

again and told him to leave those books alone.    I told him I could not count those ballots and watch the books.    I said, I will tell you what I'll do.    You leave those books alone until we count how many ballots come out of the box.    Then I will tell you what you can do with them.    That was decided on. The books were left there.    We counted the ballots out of the box, and when 372 ballots came out of the box I said : ' Now you can take the books and pad them as you padded the box.' Charlie Judge picked the books up and took them in the back room."

" Q.  What was  the  defendant Williams  doing  during this time ?  A. Mr. Williams was helping count the returns.  Q. Who kept the voters' list during that day ?    A.  The two clerks."

Hartman, a  co-defendant with the  appellant, testified that the counting of the ballots, in which the appellant was engaged, occupied them " up until twelve o'clock in the evening."    That then the return sheets were executed in triplicate, all signing there together.    With this evidence before them, could a jury fairly infer that the occurrences of the day were of a character to put an honest member of the election board on guard as to the return he would sign?    Would they have warrant for finding that, if the appellant had honestly kept his voting list during the day showing 172 votes cast and then counted 372 ballots out of the box, he could not have refrained from protesting against the crime thus openly committed?    Can it be said that if he signed the returns as late as midnight those returns did not then fully exhibit the evidence of the wrong that had been perpetrated?    There is no tribunal that can answer such questions but a jury.    That tribunal having declared, after a submission to them of all the evidence in a manner of which no complaint has been made, that the appellant must have had at least a guilty knowledge of the daring crime which deliberately overthrew the legally expressed will of the electors, we find ourselves wholly unable to say, as matter of law, that there is no evidence on which their verdict can rest.    The seventh assignment of error is therefore overruled and the appeal is dismissed at the cost of the appellant, the judgment is affirmed and the record remitted to the court below with direction to have the sentence put into execution.